**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180073-U

Order filed April 6, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0073 Circuit No. 16-CF-163 |
| WILLIAM DALE NELSON, | ) ) ) | Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE CARTER delivered the judgment of the court.
Justices O'Brien and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    The evidence at trial was sufficient to prove defendant guilty beyond a reasonable doubt of criminal sexual assault and aggravated criminal sexual abuse. Defendant's conviction for aggravated criminal sexual abuse merged with his conviction for criminal sexual assault pursuant to one-act, one-crime principles.

¶ 2    Defendant, William Dale Nelson, appeals his convictions for criminal sexual assault and aggravated criminal sexual abuse. Defendant argues that the evidence was insufficient to prove him guilty of either offense. Defendant alternatively argues that his conviction for aggravated

criminal sexual abuse should be vacated based on one-act, one-crime principles. We affirm in part and vacate in part.

¶ 3                                      I. BACKGROUND

¶ 4        Defendant was charged with criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)) and aggravated criminal sexual abuse (*id.* § 11-1.60(b)). The charges were filed on March 4, 2016.

¶ 5        A bench trial was held. During opening statements, the State indicated that the case pertained to one sexual act. The State said that the two charges in the indictment were different ways to charge the same sexual act.

¶ 6        M.B. testified that defendant had been her stepfather since she was five or six years old. At the time of the incident, M.B. was 16 years old. She lived in a house with defendant, Sammie Nelson (her mother), Sandra B. (her grandmother), her three younger siblings, her aunt, and her uncle. The first floor had a living room, a kitchen connected to the living room, a bathroom, and a bedroom used by defendant and Sammie. Sandra slept on a chair in the living room. Sandra often slept with the television on and could "sleep through just about anything." There were two bedrooms and an unused bathroom upstairs. M.B. and her siblings slept in one of the upstairs bedrooms sand her aunt and uncle slept in the other. It was a fairly small house for so many people to live in, and it was easy to hear what people were doing in other rooms.

¶ 7        M.B. initially stated that the incident occurred in July or August 2014. She later said it occurred in late August or early September 2014. She believed that she had recently begun her junior year in high school at the time of the incident. She said that school had started but it was still warm outside. She knew that it happened on a school night.

¶ 8    On the evening of the incident, M.B.'s boyfriend, D.M., was at M.B.'s house. D.M. had been there for several hours. M.B. and D.M. sat at the kitchen table during that time. D.M. left around 11 p.m. because M.B. had to get ready for bed. M.B. said that her bedtime was 11 p.m., and D.M. could stay over until 11 p.m. on school nights.

¶ 9    While D.M. was at the house, M.B.'s siblings, aunt, and uncle were upstairs. Defendant was in his bedroom. M.B. did not know if Sammie was home. M.B. believed that Sammie worked evenings at a root beer stand at the time of the incident, but she would have been home from work by 10:30 p.m. at the latest. Sandra was in the living room watching television. Sandra could see into the kitchen if she turned her head.

¶ 10    Initially, M.B. said that she could not recall anyone else entering the kitchen while D.M. was there. On cross-examination, M.B. said that other members of her family would have come into the kitchen at some point if D.M. had been there for several hours. M.B.'s aunt and uncle had an infant, and they would enter the kitchen every couple of hours to make bottles. M.B. said that her sister entered the kitchen a couple times while D.M. was there. M.B. did not recall defendant entering the kitchen while D.M. was there.

¶ 11    After D.M. left, defendant entered the kitchen. Defendant told M.B. that he had seen her and D.M. doing something inappropriate. Defendant told M.B. that he wanted her to do what he just saw her do to D.M. The prosecutor asked M.B. if defendant had observed her do anything to D.M., and M.B. said yes. M.B. testified that she understood defendant to mean that he wanted her to touch his penis. Defendant told M.B. that he would tell Sammie that he saw her and D.M. do something inappropriate if she did not touch him.

¶ 12    M.B. put her hand on defendant's penis. Defendant indicated that he wanted M.B. to perform oral sex on him by placing his hand on her shoulder and pushing her down. M.B.

3

performed oral sex on defendant. Defendant was sitting in a kitchen chair. M.B. stated that this lasted for "at least a half an hour." M.B. did not notice anything odd about defendant's penis. The incident ended when defendant ejaculated. M.B. then went to the bathroom, got ready for bed, and went up to her bedroom. Her siblings were already asleep. If Sandra had woken up or if anyone had come downstairs to use the bathroom, they would have seen defendant and M.B. in the kitchen.

¶ 13        On cross-examination, M.B. said that she did not actually do anything sexual with D.M. on the evening of the incident. Defense counsel asked M.B. how she knew what defendant meant. M.B. said that defendant had caught her and D.M. "doing things" before, and she assumed that was what he was talking about. M.B. stated that she often got into arguments with Sammie and defendant about her physical contact with D.M., and they frequently checked on her when D.M. was over. However, no one checked on M.B. and D.M. on the evening of the incident. M.B. was afraid that Sammie would be mad at her if defendant told her that she did something sexual with D.M. even though she did not do anything. M.B. said that Sammie tended not to believe her over other people.

¶ 14        M.B. did not cry out or try to get help from Sammie or Sandra before or after the incident. M.B. did not think they would believe her. M.B. later told the police about the incident when she was being interviewed concerning unrelated allegations.

¶ 15        M.B. stated that she previously told a police officer that defendant did not ejaculate. Defense counsel asked M.B. why she told the officer that. M.B. replied, "The officer was asking me questions directly and then that question he did not ask me directly." M.B. said she told the officer that defendant did not ejaculate because she was upset that the officer had stopped asking her direct questions. M.B. admitted that she lied to the officer.

4

¶ 16    M.B. stated that she also told the officer that defendant was standing during the incident, and she did not tell the officer that defendant pushed her down to her knees. M.B. explained that it was embarrassing to tell the story to the officer. She said: "I felt that if someone does something illegal, it's not all the facts that matter." She did not think the officer needed to hear the entire story exactly the way it happened, but she was telling the entire story exactly how it happened in court. M.B. told the officer that defendant touched her during the incident. M.B. initially testified that defendant did not actually touch her, but she later stated that she could not recall whether he did.

¶ 17    The State rested.

¶ 18    Sammie testified for the defense. At the time of the incident, Sammie did not work evenings. In September 2014, Sammie would have been home on a typical evening. On a school night, M.B.'s bedtime would have been between 9 and 10 p.m. M.B. was allowed to stay up until 11 p.m. on weekends. The other children had to go to bed earlier. Sammie occasionally argued with M.B. about doing inappropriate things with D.M.

¶ 19    Sandra testified that when D.M. came over, he and M.B. typically watched television in the living room. They were never alone in the kitchen because there were so many people in the house. M.B.'s bedtime on school nights was at 10 p.m., so D.M. typically left between 9 and 9:30 p.m. Sandra testified that she was a light sleeper, and she usually did not fall asleep until 1 a.m. She said that "the least little thing" would wake her up. Sandra would have had to turn her head to see the kitchen from her chair. She could hear everything happening in the kitchen from her chair if she wanted to, but sometimes when she was watching television she would ignore what was happening in the kitchen. She did not recall hearing anything inappropriate between defendant and M.B. in September 2014.

5

¶ 20      Defendant testified that in the summer and fall of 2014, he argued with M.B. about her and D.M. being on the couch together under the same blanket. He did not argue with M.B. about doing anything else with D.M. at that time. M.B.'s bedtime was 10 p.m. on school nights and 11 or 11:30 on weekends. Defendant testified that it would have been impossible for M.B. and D.M. to be alone in the kitchen for several hours on the evening of the incident. Defendant said that there were too many people in the house for that to be possible, and he never would have allowed them to be alone for that long. Defendant said that he set alarms on his phone to remind him to check on M.B. and D.M.

¶ 21      Defendant testified that he would have been in his bedroom on his computer on a typical night in the fall of 2014. Defendant testified that he never had sexual contact with M.B. or asked her to have sexual contact with him. Defendant stated that if M.B. had seen his penis, she would have seen that he had genital warts.

¶ 22      Defendant said that in April 2015, he caught M.B. and D.M. doing something inappropriate on the porch. He broke it up. He did not wait until after D.M. left to confront M.B. about it. Defendant told Sammie about the incident on the porch, but not on the night it happened.

¶ 23      Detective Joe Vissering testified for the State as a rebuttal witness. Vissering stated that he had interviewed defendant in connection with the instant case. Defendant told Vissering that he observed M.B. and D.M. engage in physical contact on the porch. Defendant said that he had a conversation with M.B. about it in the kitchen after D.M. left. Defendant said that no one else was in the room. Defendant said he did not tell Sammie about it.

¶ 24      The court found defendant guilty of criminal sexual assault and aggravated criminal sexual abuse. The court said that it wished that M.B.'s statements had been more consistent and

6

that "things matched up better." The court noted that M.B. was 18 years old during the trial and 16 years old during the incident. The court stated: "I'd hate to see how I would hold up at those ages." The court stated that it found M.B. "sufficiently believable" despite the discrepancies in her testimony. The court noted that M.B. was not evasive and her testimony seemed sincere. The court said that it could not say the same about defendant.

¶ 25 During a hearing on defendant's motion for a new trial, the court stated that it found M.B.'s testimony to be credible. It found Sandra's testimony not to be credible because Sandra volunteered information helpful to the defense several times when it was not responsive to the question asked of her. The court found defendant's testimony not to be credible. The court found Sammie's testimony to be largely irrelevant to the question of whether defendant was guilty because it involved mostly ancillary issues.

¶ 26 The court sentenced defendant to concurrent sentences seven years' imprisonment for criminal sexual assault and three years' imprisonment for aggravated criminal sexual abuse.

¶ 27                                    II. ANALYSIS

¶ 28                              A. Sufficiency of the Evidence

¶ 29 Defendant argues that the trial evidence was insufficient to prove him guilty beyond a reasonable doubt of criminal sexual assault and aggravated criminal sexual abuse because M.B.'s testimony was uncorroborated and was not credible. We find that the evidence, viewed in the light most favorable to the State, was sufficient to prove defendant guilty of both offenses.

¶ 30 When presented with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

7

beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

> "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt. [Citation.] Under this standard, the eyewitness testimony may be found insufficient 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' [Citation.] A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *People v. Gray*, 2017 IL 120958, ¶ 36 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)).

¶ 31        "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Though not binding on the reviewing court, "the fact finder's decision to accept testimony is entitled to great deference." *Cunningham*, 212 Ill. 2d at 280.

¶ 32        To prove defendant guilty of criminal sexual assault, the State was required to prove that defendant committed an act of sexual penetration with the victim, was a family member of the victim, and the victim was under 18 years old at the time of the offense. 720 ILCS 5/11-1.20(a)(3) (West 2014). "Sexual penetration" is defined as "any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person." *Id.* § 11-0.1. A "family member" includes a stepparent or stepchild. *Id.*

8

¶ 33      To prove defendant guilty of aggravated criminal sexual abuse, the State was required to prove that defendant committed an act of sexual conduct with a victim who was under 18 years old and a family member. *Id.* § 11-1.60(b). "Sexual conduct" is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1.

¶ 34      Viewed in the light most favorable to the State, the trial evidence was sufficient to prove defendant guilty beyond a reasonable doubt of criminal sexual assault and aggravated criminal sexual abuse. M.B.'s testimony established that defendant was her stepfather and that she was 16 years old at the time of the offense. M.B. testified that she performed oral sex on defendant after he threatened to tell Sammie that he saw her and D.M. doing something inappropriate. This act meets the definition of both sexual penetration and sexual conduct. See *id.* The court found M.B.'s testimony to be credible. While M.B.'s testimony was uncorroborated, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36.

¶ 35      We reject defendant's argument that it was unreasonable for the court to find M.B.'s testimony to be credible because her account of the incident was improbable. Defendant contends that M.B.'s story that she performed oral sex on him in the kitchen for 30 minutes was improbable because there were several other people in the house at the time. Defendant notes that Sandra would have seen it if she had woken up, as would anyone who came downstairs to use the bathroom. However, the incident occurred at night when Sandra and M.B.'s siblings were sleeping. It is not improbable that no one would have come downstairs to use the bathroom during the time it took for M.B. to perform oral sex on defendant. Also, M.B. testified that

9

Sandra could "sleep through just about anything." While Sandra testified that she was a light sleeper, the court found that her testimony was not credible.

¶ 36    Defendant also contends that it is improbable that M.B. would agree to perform oral sex on defendant to prevent him from telling Sammie that she engaged in sexual conduct with D.M. However, M.B. testified that she had been in arguments with Sammie in the past about her physical contact with D.M. and that Sammie tended not to believe her. Given M.B.'s young age and defendant's position of authority as her stepfather, it is not implausible that she would engage in sexual conduct with him out of fear that Sammie would be angry with her if defendant told her that M.B. had engaged in sexual conduct with D.M.

¶ 37    We acknowledge that M.B. did not tell anyone about the incident at the time that it occurred. However, this does not render her testimony unworthy of belief. Defendant was M.B.'s stepfather, and M.B. testified that she did not think her mother or grandmother would believe her if she told them about the incident. See *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993) ("A delay in reporting incidents of sexual assault may be reasonable where the victim's silence is attributed to fear, shame, guilt and embarrassment."); *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993) ("In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry.").

¶ 38    We also acknowledge that there were inconsistencies between M.B.'s trial testimony and her statements to the police. For example, M.B. testified that defendant ejaculated but she told the police that he did not. M.B. said that she lied to the police about this because the officer did not ask her about it directly. It is troubling that M.B. lied to the police about whether defendant ejaculated. However, given her young age and embarrassment at recounting the story, it is plausible that she did not want to discuss this detail with the officer since she was not asked

10

about it directly. M.B. also told the officer that defendant touched her during the incident. However, M.B. initially testified that this did not happen and later that she could not recall whether it happened. M.B. also acknowledged that she did not tell the officer that defendant pushed her down to indicate that he wanted her to perform oral sex on him. M.B. stated that she did not think it was necessary for the officer to know all the details. Again, given M.B.'s young age and embarrassment recounting the incident to the officer, it is plausible that she may not have wanted to discuss all the details. We do not believe that these inconsistencies compel the conclusion that no reasonable person could have accepted M.B.'s testimony beyond a reasonable doubt. See *Gray*, 2017 IL 120958, ¶ 36.

¶ 39    Defendant asserts that other inaccuracies and inconsistencies in M.B.'s testimony render it unworthy of belief, including whether any of her family members entered the kitchen on the night of the incident before D.M. went home, whether anyone checked on her and D.M. on the night of the incident, and the month in which the incident occurred. Defendant also notes that M.B. testified that D.M. left around 11 p.m. because that was her bedtime, while her other family members testified that her bedtime was 10 p.m. These inconsistencies concern relatively minor details regarding ancillary matters rather than the offense itself, and they do not compel the conclusion that no reasonable person could have accepted M.B.'s testimony beyond a reasonable doubt. See *id.*

¶ 40    We reject defendant's argument that the trial court's conclusion that M.B. was credible should not receive a normal degree of deference because the court's finding of guilty "was apparently based on an erroneous mode of analysis whereby [it] started out assuming that M.B.'s statements were true rather than presuming [defendant] to be innocent." Defendant argues that

11

the following remarks that the court made during its pronouncement of guilt showed that it employed this "erroneous mode of analysis":

"Now, does [M.B.]'s inconsistent claims or claims that don't match up some of the time knock down her truth telling in my eyes, so much so that I would find that the—I'm asking a question—did it go down enough where I would find the State did not meet their burden of proof? That's the question to me. And I mean, there are more questions; that's the most important question to me. And I think that [M.B.] was sufficiently believable ***."

We disagree with defendant's characterization of the court's remarks. The court showed that it was considering whether the inconsistencies in M.B.'s testimony rendered it incredible or unworthy of belief. This was a proper consideration. The court's remarks did not indicate that it failed to presume that defendant was innocent.

¶ 41                                    B. One-Act, One-Crime

¶ 42          Defendant argues that his conviction for aggravated criminal sexual abuse should be vacated under one-act, one-crime principles because it was based on the same act as his conviction for criminal sexual assault, namely, a single act of oral sex. Under the one-act, one-crime doctrine, "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *People v. Coats*, 2018 IL 121926, ¶ 11. The State concedes that its theory at trial was that the two charged offenses concerned the same conduct and that defendant's conviction for aggravated criminal sexual abuse should be vacated. After reviewing the arguments of the parties, the record, and the applicable law, we accept the State's confession of error.

¶ 43                                    III. CONCLUSION

12

¶ 44    Defendant's conviction for criminal sexual assault is affirmed. Defendant's conviction for aggravated criminal sexual abuse is vacated under the one-act, one-crime doctrine.

¶ 45    Affirmed in part and vacated in part.